Montgomery v. State.

## F. G. MONTGOMERY v. THE STATE. *
## (*Nashville.* December Term, 1915.)

1. **INTOXICATING LIQUORS.  Illegal sales.  Fraternal club.**

One directing the dispensing of intoxicating drinks as "president" of a club composed mostly of drinkers, the front door of which was kept locked, and the glass panels thereof kept opaque by deep paint, the members entering by a side door from a dark unlighted alley, they being sworn to secrecy and paying for the expenses and "president's" salary by proceeds of coupon books for liquor payments, the club having obtained a federal retail liquor license, *held* guilty of violation of the law, forbidding selling intoxicating liquor within four miles of an institution of learning.  (*Post, pp.* 578-584.)

Case cited and distinguished:  Moriarty v. State, 122 Tenn., 440.

Case cited and approved:  Tenn. Club of Memphis v. Dwyer, 79 Tenn., 452.

2. **INTOXICATING LIQUORS.  Prosecutions.  Presumptions.**

In prosecution for illegal retail liquor selling, by statute there is a presumption of guilt arising from the possession of a United States internal revenue license for the retail sale of intoxicating liquors.  (*Post, pp.* 584, 585.)

Case cited and approved:  Hermitage Club v. Shelton, 104 Tenn., 101.

3. **CRIMINAL LAW.  Appeal.  Reversal.  Failure to instruct. Statute.**

Where refusal to give proper instructions does not affect the result, the verdict being fully in accord with the merits of the case, the case must be affirmed, under Acts 1911, ch. 32, providing that no verdict or judgment shall be set aside or any criminal cause for error in the charge, etc., unless in the opinion of the appellate court it affirmatively appears the error has affected the result.  (*Post, p.* 585.)

Acts cited and construed:  Acts 1911, ch. 32.

---

*As to applicability of liquor laws to social clubs dispensing liquors to members, see notes in 12 L. R. A. (N. S.), 519; 20 L. R. A. (N. S), 1095; 23 L. R. A. (N. S), 192; 38 L. R. A. (N. S), 101 and L. R. A, 1915C, 876.

135 Tenn.—37

FROM DAVIDSON.

Appeal from the Criminal Court of Davidson County. —A. B. NEIL, Judge.

CHESTER K. HART, for appellant.

FRANK M. THOMPSON, Attorney-General for the State.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error was indicted in the criminal court of Davidson county for violation of the four-mile law; that is, selling intoxicating liquors within four miles of an institution of learning. 'He was convicted, and has appealed to this court. His defense is that his act does not fall within the statute because he was merely dispensing liquors as an officer, "president" and "custodian" of the Cumberland Fraternal Club, a fraternal organization whose habitat was at 208 Broad Street, in the city of Nashville.

The evidence is, in substance, as follows: The club is composed of 400 members, mostly drinking men, but there are a few who do not drink. The front entrance is on Broad street, but it is never used; the door is kept locked; and its glass panels are so deeply painted over that no one from the outside can look through them into

the club rooms. The members enter only through a side door which opens out on an alley, which is unlighted, and dark at night. Inside there is a buffet at which are dispensed, to members only, beer and whisky, by the porters of the club, under the direction of the "president." The members pay for these drinks with coupons detached from coupon books which are sold to them. It is so arranged that the proceeds of these books pay in full, and no more, the cost of the liquors, the wages of the porters, and the salary of the "president," who dispenses them. His salary is $25 per week. No books are kept. When the coupons are sold the money is placed in the "president's pocket, and it is paid out from the same receptacle. He testifies that the club has a bank account, but he knows not the name of the bank, nor, so far as this record shows, does any one else know. There is an initiation fee of $1, and annual dues of $1, per member. The purpose of this fund is the payment of all expenses other than those for drinks, and service of drinks. This fund is collected by Mr. Sherry, the secretary, but he was not offered in evidence, and the president does not know what Mr. Sherry has done with the money. The rent of the building is $40 per month, aggregating $480, which exceeds the income from dues to the extent of $80. There is also an outstanding debt of $500 for furniture, purchased from Mr. Sherry, the current secretary, who had run a "soft-drink" business in the same place, which was broken up under the nuisance

law.   The "president" testifies that it is a part of the
plan to pay sick benefits to members, but that no funds
are provided for this purpose.   As to the membership,
some of the most respectable men of the city belong,
and any respectable man may become a member, and
careful inquiry is made on this head when application
comes in; but all are required to take an oath of se-
crecy.   There is no other initiation rite.   There is a
reading and writing room furnished with large, easy,
leather bottom chairs and a leather davenport, and
with paper, pens, and ink and tables to   write   on.
There are six other rooms, upstairs, and they are fitted
up as bedrooms, where members may recline if they
wish, and where some of them do take afternoon naps.
Sometimes, also, when the weather is bad, members
sleep in these rooms all night.   Some daily papers are
taken for the use of the members, also several maga-
zines, Puck, Judge, Munsey's, Red Book, the Cosmo-
politan, the Literary Digest, and, it is said, quite a
number of other magazines but their names are not
given.   Some of the members often meet in the rooms
and talk and read the papers and magazines.   There
are some costly and beautiful pictures on the walls,
loaned by one of the members, and the whole house is
fitted up for the ease and comfort of the members,
for which no extra charge is made.   The "president"
sees to it that there is no loud talking, or rude or bois-
terous behavior of any kind, and that there is no gamb-
ling nor even card playing.   The club obtained from
the United States government what is popularly called

a federal retail liquor license, that is, a receipt for the internal revenue tax, describing the business of the "Cumberland Fraternal Club," as that of "retail liquor dealer," at 208 Broad Street, Nashville, Tenn. The "president" testifies, however, that this was procured only to avoid trouble with the federal government. Besides beer and whisky, the club keeps on hand soda water, and other "soft drinks," sandwiches, etc. Only a relatively small quantity of liquors is kept on hand. There are, as stated, several members who do not drink at all. They come to the clubhouse often, and read, or lie down and take a nap, or meet the other members for purposes of sociability, or to make acquaintanceships.

In the foregoing statement we have used the present tense, as if the club were still an existing institution, but it appears from the evidence that since the present prosecution was begun, the club had been proceeded against as a public nuisance, on the ground that it was selling whisky, and had been put out of business by a permanent injunction.

When the officers raided the place, preliminary to the present proceeding, they found in the room where the buffet was, "President" Montgomery and a negro porter; and also several men, all members of the club, sitting at tables drinking beer. They found several dozen bottles of beer on ice, also two casks of beer stored in the place. In an iron safe, not locked at the time, they found several bottles of whisky, quarts, pints, and half pints. Some whisky was also found on

shelves behind the drinking tables. There were no bar fixtures. There was an ice box, and there were several tables and chairs in the room. The place in question had formerly been occupied as a saloon, during the period when saloons were in operation in the city of Nashville. After that time, and before the club occupied the house, it had the reputation of being a "bootlegging joint," and had borne the same reputation while the club was occupying it.

The first error assigned is that there is no evidence to support the verdict, and the second that the evidence preponderates against the verdict.

Both must be overruled. We think it very clear that the chief purpose of the club was the selling and drinking of intoxicating liquors. The other things were mere incidents, added to give the enterprise an appearance of lawfulness. Else why the oath of secrecy, the closed and locked front door, with its glass panels so thickly coated with paint that no one could see through; why the secret side door opening upon the dark, unlighted alley, through which all the "members" entered and left the building? We were told long ago that those whose deeds are evil love darkness rather than light, and that men must be judged by what they do, "by their fruits shall ye know them." Can the incriminating evidence  recited  be covered over and lost to view by the fact that many respectable men visited the place, and that there were six beds for 400 men? Or by the fact that some of the members, a few, were not drinking men, and attended only to

meet persons whom they might see, to form acquaintanceships and the like, or to read the papers and magazines, or take naps on the beds? These entered and left by the same dark way which those used who came for drinks only. They saw the shaded and locked front door, and they too took the oath of secrecy. So, it matters not that they did not drink; they were full participants in the scheme and as guilty as the rest. The club was a mere device to mask the sale and purchase of intoxicating liquors. It was simply a conveniently appointed saloon, with a selected and numerous list of regular, reliable patrons. The case does not fall under *Moriarty* v. *State,* 122 Tenn., 440, 124 S. W., 1016, 25 L. R. A. (N. S.), 1252, nor *Tennessee Club of Memphis* v. *Dwyer,* 11 Lea, 452, 47 Am. Rep., 298.

Without referring to any other, a sufficient distinction is that the funds used in buying the liquors were those of the plaintiff in error, realized by the sale of the coupon books, and those received by sale of liquors, which funds were appropriated by him, in their totality, without any accounting to the club, in any form whatsoever. So that, even if the club could, under the facts, be held a *bona fide* fraternal organization, the same facts would show that he simply carried on a saloon business within it for his sole benefit. But in the cases referred to there was no doubt that the organizations were *bona fide* social bodies, and the dispensing of liquors was but a small incident of their existence. Here the case is far different, and well justifies the warning of our late much-loved brother, Chief Justice Beard, in *Moriarty* v. *State,* supra, viz:

"It may be proper to observe, in conclusion, that it is a matter of common knowledge, of which we may take judicial notice, that since the legislative enactment of the various statutes, extending from time to time the territorial scope within which intoxicating liquors cannot be legally sold, clubs have sprung up in great numbers in different localities, and obtained charters, whose apparent purpose is to evade, if possible, under the forms of law, the effect of these statutes. It is hardly necessary to say that such a club can find no warrant for its existence in the present holding. Whenever in any case, the legality of its action . . . is challenged by the State, it will be the duty of the court to scrutinize closely, in order to see that no such device is attended with success. In every case, when the serving of liquor to members, or others, is the principal purpose, or one of the chief objects, of such an organization, and not a mere incident, or when it is sold for a profit, this being carried into a general fund for meeting the expenses, or into a special fund for the payment of salaries, or for distribution among its members, or otherwise, the disguise should and will be uncovered, and the club and its members made amenable to the law."

As stated, in the *Moriarty Case,* not only was it clear that the organization there under examination was a *bona fide* social and charitable body, but there was no contention by the State to the contrary, as pointedly remarked by the Chief Justice. Furthermore, in drawing the distinction between that case and *Hermitage*

*Club* v. *Shelton,* 104 Tenn., 101, 56 S. W., 838, it was pointed out that in the latter case, while not in the former, the plaintiff in error had to overcome the statutory presumption of guilt arising from the possession of a United States internal revenue license for the retail sale of intoxicating liquor. The plaintiff in error labors under the weight of the same presumption here, and he has not removed it by the facts presented. On the contrary, he has but strengthened and confirmed it.

The remaining assignments of error are based on the charge of the trial judge, and his refusal to change certain instructions offered.

Without copying these instructions here, we may say they were such as should have been given by the trial judge, but under the facts proven we are very clearly of the opinion that the failure to give these did not affect the result, and that the verdict of the jury is fully in accord with the merits of the case. Under such circumstance it is our duty not to reverse but to affirm. Acts 1911, chapter 32.

The last assignment is that there was affirmative error in the charge as given. In this view we do not concur.

The result is the judgment of the trial court is affirmed.